## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**CHRISTOPHER MILLER**
                                     **CIVIL ACTION**

**VERSUS**

                                     **NO. 12-138-JWD-RLB**

**CAPTAIN CREDIT, ET AL.**

## RULING AND ORDER

This matter comes before the Court on the Defendants' Motion to Alter or Amend Judgment, or in the Alternative, Motion for New Trial or Remittitur (R. Doc. 134). Plaintiff Christopher Miller opposes the motion. (R. Doc. 136). Oral argument was previously scheduled for July 28, 2015. Upon reconsideration, oral argument is not necessary.

Considering the law and facts in the record, Defendants' motion is DENIED.

### I. Introduction

Plaintiff filed suit against Defendants Darius Credit and the State of Louisiana. (R. Doc. 1-1). Plaintiff alleged that, on February 8, 2011, he was asleep on the top bunk at Elayn Hunt Correctional Center when Credit, without cause, grabbed Miller and physically flung him to the ground. (*Id.*). Plaintiff claimed that Credit violated Plaintiff's Eighth Amendment right to be free from excessive force. (*Id.*). Alternatively, Plaintiff claimed that Credit was negligent and that the State was vicariously liable for Credit's conduct.

A jury trial in this matter was conducted from March 23, 2015, to March 25, 2015. (R. Docs. 123-127). On March 25, 2015, the Jury rendered a verdict in favor of the Plaintiffs, finding that Credit was negligent. (R. Doc. 126). The jury apportioned fault by assigning 75% fault to Plaintiff and 25% fault to the Defendant. (*Id.*). Compensatory damages were awarded in

a lump sum in the amount of $300,000.00. (*Id.*).  Thus, the total award to Miller was $75,000.00.

(*Id.*).

The instant motion was filed on April 21, 2015. (R. Doc. 134).  In sum, Defendants assert

three main arguments.  First, the judgment should be altered or amended because the jury

committed a manifest error in fact by finding that Credit was negligent.  Second, the Court

should order a remittitur or new trial on the issue of damages because the jury award was

excessive.  And third, the Court should order a new trial on all issues because the jury award was

so excessive that it was the result of "passion or prejudice."  The court will address each of these

in turn.

## II.  Motion to Alter or Amend Judgment

### A.  Defendants' Arguments

Defendants argue that the judgment should be altered or amended because the Plaintiff

failed to prove that Credit was negligent.[1]  Defendants rely on the "objective medical evidence"

and the expert testimony of Dr. Messina and Dr. Boudreaux in support of their motion.  In short,

Defendants claim that Miller suffered no damages.

### B.  Legal Standard

Federal Rule of Civil Procedure 59(e) provides that a "motion to alter or amend a

judgment must be filed no later than 28 days after the entry of the judgment."  "A Rule 59(e)

motion 'calls into question the correctness of a judgment.'" *Templet v. HydroChem Inc.*, 367

F.3d 473, 478 (5th Cir. 2004) (quoting *In re Transtexas Gas Corp.*, 303 F.3d 571, 581 (5th Cir.

2002)).  The Fifth Circuit has held that a Rule 59(e) motion "is not the proper vehicle for

rehashing evidence, legal theories, or arguments that could have been offered or raised before the

---

[1] While Defendants suggest they are challenging the jury's finding that Credit was negligent, their brief
never addresses the issue of negligence.  Rather, Defendants center their argument on causation and
damages.

2

entry of judgment." *Templet*, 367 F.3d at 478-79 (citing *Simon v. United States¸* 891 F.2d 1154, 1159 (5th Cir. 1990)). Instead, Rule 59(e) "serves the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." *Templet*, 367 F.3d at 479 (quoting *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473 (5th Cir. 1989)) (alterations omitted). "Reconsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly." *Id.* (citations omitted).

### C. Analysis

Defendants' motion fails for two reasons. First, while they cite to certain facts in support of their motion, a reasonable juror could draw different inferences from these facts than those advanced by the Defendants. Second, there are additional facts which Defendants ignore that also support the verdict. In sum, the Defendants have failed to sustain their burden of showing a manifest error of fact so as to justify this extraordinary remedy.

### 1. Defendants' Evidence Arguably Supports the Verdict

Defendants cite to several pieces of evidence which they contend support a verdict in their favor. However, a reasonable juror could draw other inferences from this evidence.

Concerning the "Objective Medical Evidence," on February 8, 2011 (the day of the incident), a Health Care Request Form (Defs.' Ex. 3 at 71) was completed. Defendants cite to the facts that, in this document, (1) Miller complained of shoulder and upper back pain; (2) Miller told the health care personnel that the pain was a 3/10 and that the onset was "When I woke up this morning;" and (3) this was described as a "Routine Sick call." However, a juror could infer from the 3/10 pain scale that Miller did in fact suffer some injuries, and the pain could have increased later. Further, the fact that Miller said he suffered the pain "When [he]

woke up this morning" does not exclude the possibility that Credit was responsible. Finally, "shoulder and upper back pain" is not necessarily inconsistent with a dislocated shoulder.

Moreover, on February 11, 2011, a Health Care Request Form (Defs.' Ex. 3 at 68) was completed. Defendants cite to the fact that Miller complained of a dislocated shoulder "while lying down." But this again is not entirely inconsistent with Miller's account that Credit pulled Miller out of bed.

## 2. Review of the Other Evidence Concerning Damages

Additionally, there was other evidence which Defendants ignore. This evidence supports a finding of liability and damages in this case. The Court will begin by reviewing evidence in support of Defendants' motion and will then review the Plaintiff's evidence.

### a. Defendants' Evidence

Concerning the "Objective Medical Evidence," Defendants cite to the fact that Miller received medical treatment for complaints of his shoulder popping out of joint and/or dislocating nine times before the incident. Defendants also cite to the fact that Miller did not tell Hunt, Phelps Correctional Center, or Dr. Blanda about his prior shoulder problems.

Additionally, Dr. Messina testified to the following to support the Defendants: Miller had a history of shoulder problems dating back to 2005. Miller's two MRIs - the first, from June 11, 2009 (before the incident), and the second from Sept. 15, 2011 - showed he had a Bankart lesion. Thus, nothing could have helped him except surgical reconstruction. Further, Miller needed surgical reconstruction in June of 2009; otherwise, his shoulder would continue to pop out of the socket. The only surgical operation that would help Miller would be a Bristow or Latarjet procedure, which costs about $2,000. Credit touching Miller's shoulder on Feb 8, 2011 had no

bearing on his need for surgery. Finally, physical therapy made his shoulder worse and was "not money well spent."

Finally, concerning Dr. Boudeaux, Defendants cite to the facts that (1) Miller made more money in 2011 (the year of the incident) than he did in eight of the ten years preceding the incident and (2) Boudreaux said there was "no reason for me to do a future loss calculation" because he was asked to assume that Miller could go back to work making at least as much money as he had demonstrated an ability to earn prior to the incident.

### b. Plaintiff's evidence showing that motion should be denied

#### i. Lay testimony from the Plaintiff and his family concerning his injuries

Miller testified extensively about the fact that, while he was injured in 2009, his shoulder was healthy five weeks afterward. (Transcript of Record, R. Doc. 130, at 107-08). Miller said that he had problems before but that his shoulder is much worse since the incident (Transcript of Record, R. Doc. 131, at 57). Miller also stated that, in all nine prior examples of shoulder pain, there was no prior instance where his arm was out of place for two days or where a doctor had to put his arm back into place. (*Id.* at 62). Miller further testified that he did not tell Hunt about his prior shoulder injuries because it had healed. (R. Doc. 130 at 110). Miller said in March 2010, he was fine, active, could swim and be involved with his kids. (R. Doc. 131 at 62-63). When he got to Hunt in Jan. 2011, his shoulder was healed, and he could play baseball, basketball, football, box, and swim. (*Id.* at 64).

Contrary to Defendants' evidence, an eyewitness to the incident, Blake Francis, testified that Miller's left arm was slouching really badly after the incident. (R. Doc. 131 at 71). While Dr. Messina expressed skepticism of any dislocation (*Id.* at 231), a reasonable juror could infer from this eyewitness account that the shoulder was in fact dislocated during the incident.

Cheryl Miller, the Plaintiff's mother, testified that after Christopher Miller hurt his arm playing basketball,[2] Miller was able to play sports, do house chores, cut grass, and everything else. (*Id.* at 75). He was active in the lives of his kids and would play football, basketball, skating, and everything. (*Id*. at 76). After 2010 until the time of the accident, there were no shoulder problems. (*Id*.). After Captain Credit pulled Miller out of the bunk, Miller's shoulder would come out when he picked up a bag of trash to bring to the road, when he lay in his bed, or when he played sports. (*Id*. at 77). Defendants tried to impeach Cheryl Miller by showing her deposition transcript, where she said that he had no prior shoulder injury, but she clarified at trial that she did not understand the question at the deposition and thought Defendants meant broken or something like that. (*Id*. at 83). On rebuttal, Cheryl reiterated that, after the incident, Christopher could not help around the house or play sports and that he would cry in the house because he knows he cannot play any sports with his children. (*Id*. at 85).

In sum, there is extensive lay testimony concerning causation and the extent of the Plaintiff's injuries following the incident with Credit.

### ii. Medical Records

The first MRI was done on June 12, 2009 (See Defs.' Ex. 6 at 216). The radiologist's report provides:

Findings:

No discreet biceps tendon pathology identified. The rotator cuff here tendons appear intact although there may be a small undersurface tear of the supraspinatus tendon. There appears to be a focal small cortical defect in the underlying humeral head here with a small amount of fluid. There is a mild edema at the acromioclavicular joint without malalignment.

Impression: Small undersurface tear supraspinatus tendon with questionable subjacent small cortical defect superior humeral head

---

[2] It is unclear from the record whether Cheryl Miller means the basketball-related dislocation in 2005 or the one in February 2010. (See R. Doc. 131 at 107 and 125),

The second MRI was done on September 15, 2011.  (See Defs.' Ex. 5 at 100).  Jeffrey Laborde was the reporting physician, and he was referred there by Dr. Blanda.  The MRI provided:

**AC joint**:  The study is positive for a small amount of free fluid in the AC joint and thickening of the inferior AC ligament indicating early osteoarthritis and arthrosis of the AC joint.

**Rotator cuff**:  There is increased signal in a linear fashion of the rotator cuff on all 3 coronal sequences. Study would indicate intralaminar changes that do not extend to either the bursal or articulating surfaces.  Study would suggest an intralaminar tear.  There is no evidence of retraction or deformity of the articulating surfaces.

**Glenohumeral joint**:  There is no joint space effusion.  Labrum is normal. Articulating surfaces of the humeral head and glenoid are intact.

…

**Surrounding musculature and tendinous structures**: Biceps tendon is in its normal position throughout.

Muscle signal intensity is normal with no evidence of inflammation or denervation.

**Impression**:

**1.  Early osteoarthritis of the AC joint creating minor rotator cuff impingement**

**2.  Increased signal of the rotator cuff consistent with an intralaminar tear. No evidence of superficial or full thickness tear.**

On September 22, 2011, Plaintiff was seen by Dr.Blanda. (Def.'s Ex. 10 at 444).  Blanda noted that Miller had an MRI on September 15, 2011, which reported as "early osteoarthritis of the AC joint creating minor rotator cuff impingement.  Increased signal of the rotator cuff consistent with an intralaminar tear.  No evidence of superficial or full thickness tear.  *I reviewed the study and agree with the report."* (emphasis added).  Blanda recommended "a course of

physical therapy."  Blanda also said there is "no mention of a Hill Sacks lesion, but I think a small defect may be present."

Thus, Blanda explicitly agreed with the findings of the September 15, 2011, MRI, which found evidence of an intralaminar tear of the rotator cuff along with osteoarthritis of the AC joint creating minor rotator cuff impingement, that the labrum was normal and glenoid intact, and that there was no Bankart Lesion.  Further, Blanda believed there was a Hill Sacks lesion, which clearly was not noted in the first MRI.  Finally, Blanda found therapy appropriate.  All of this supports the conclusion that there was some damage done by the yanking, either as an aggravation of the pre-existing shoulder injury or (with respect to the osteoarthritis and the Hill Sacks lesion) as new damage.

Other medical records support a finding of injury and damages.  On November 11, 2011, Blanda recommended physical therapy again. (Defs.' Ex. 10 at 448).  There is some indication in the record that physical therapy helped, but there were still restrictions on the Plaintiff's range of motion and rotation ability. (*Id.*).  His "impression" was of "left shoulder pain and subluxation." (*Id.*).  On December 15, 2011, Blanda also recommended a Putti-Platt procedure when it became clear physical therapy was not working. (Defs.' Ex. 10 at 452).  Blanda believed the Plaintiff has a Hill-Sacks lesion consistent with recurrent dislocation. (*Id.*).  The estimate for the Putti-Platt procedure was $3,540 (Defs.' Ex. 10 at 470).

Many of the remaining Dr. Blanda trips are uneventful but emphasize that the Plaintiff continued to have problems with his shoulder following the incident.  On February 9, 2012, Miller was again seen by Blanda. (Defs.' Ex. 10 at 456).  Blanda noted that Miller said he had "three episodes of subluxation" since the last visit and that his medications were not working as well lately. (*Id.*).  Blanda increased the dosage of Lortab. (*Id.*).  When he saw Miller again on

April 5, 2012, Blanda again recommended that Miller get his left shoulder repaired with a Putti-Platt procedure. (Defs.' Ex. 10 at 459). On July 10, 2012, Blanda saw Miller again and said he had two episodes of dislocation since the last visit and that "it is still painful." (Defs.' Ex. 10 at 462). Blanda noted that the medicines were helping. (*Id.*).

Messina disagrees with much of the radiologists' and Blanda's conclusions. Messina admits that there is no mention of the osteoarthritis in the 2009 radiologists' report but states that the osteoarthritis is evident in in the 2009 MRI. (R. Doc. 131 at 234). However, he admitted that the osteoarthritis can be caused by trauma and said he did not know if the x-rays prior to Feb 2011 showed osteoarthritis. (*Id.* at 244). Messina also disagreed with the radiologist's finding that the labrum was normal. (*Id.* at 240). Messina said that one does not get impingement with the AC joint. (*Id.* at 243-244). Finally, Messina disagreed with the necessity and propriety of a Putti-Platt procedure. (*Id.* at 249).

The medical evidence in this case required credibility determinations. On the one hand, the jury could have believed Dr. Blanda and the radiologists' reports. On the other hand, they could have sided with Dr. Messina. The jury chose the former. Defendants have not presented the type of extraordinary situation and manifest error of fact that warrants the granting of a Rule 59(e) motion. Rather, this was simply an instance of the jury believing some medical evidence (Blanda and the radiologists' reports) and rejecting others (Messina). In short, Defendants have failed to satisfy the high burden required for Rule 59(e). For this reason, Defendants' motion is denied.

### iii.    Lost Earning Capacity/Future Lost Wages

Lost earning capacity and future lost wages will be discussed in greater detail below. Suffice it to say at this point, the Plaintiff, his mother, and his father testified at length about the

Plaintiff's inability to perform tasks after the accident. Further, the medical evidence showing that he continued to have shoulder problems for up to one and a half years after the accident is a basis for a finding of future lost wages. Finally, the fact that Miller earned over $6,000 in 2011 does not mean that he suffered no lost earning capacity; he demonstrated that, in the past, he could earn over $10,000 or $14,000. Thus, the jury could have concluded that he did lose some future lost wages and lost earning capacity. This is an additional basis for denying Defendants' motion.

Further, in *Durrett v. State*, 416 So.2d 562 (La. App. 1 Cir. 1982), the Louisiana First Circuit expressly rejected the Defendants' argument that Miller could not suffer lost earning capacity because he earned more in the year following the accident than he did in prior years. In *Durrett*, the Plaintiff admitted that he was "earning presently more than he was before the accident." *Id.* at 570. Defendants claimed that this foreclosed an award for lost earning capacity. *Id.* The First Circuit rejected this argument and affirmed the trial court's award of $100,000.00. *Id.*

Thus, Defendants' argument is not only contradicted by the facts, but it is also unsupported in the law. Defendants' motion is denied.

### iv. Conclusion

In sum, Rule 59(e) motions are extraordinary remedies that should be used sparingly to correct manifest errors of fact. Here, there is clearly an adequate factual basis for the jury finding that Credit negligently caused Miller injuries and damages. Defendants' Rule 59(e) motion is denied.

### III.    Motion for New Trial or Remittitur

#### A.  Defendants' Arguments

Defendant argues that the damage award of $300,000.00 was grossly excessive.

Defendant cites to several district court cases and a single appellate decision where the jury

award was below $300,000.  According to the Defendant, Plaintiffs' injuries cannot be worth

more than $52,766.74, and Defendants claim this is out of sync with the above jurisprudence.

#### B.  Choice of Law

Under [the doctrine of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L.

Ed. 1188 (1938)], federal courts sitting in diversity apply state substantive law and federal

procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427, 116 S.Ct. 2211

(1996).  Further, the Supreme Court in *Gasperini* held that, in an action based on state law but

tried in federal court by reason of diversity of citizenship, a district court must apply a new trial

or remittitur standard according to the state law's controlling jury awards for excessiveness or

inadequacy. *See Fair v. Allen*, 669 F.3d 601, 604-605 (5th Cir. 2012).  The same rule applies to

state law claims over which the court is exercising supplemental jurisdiction. *Cf. Gasperini*, 518

U.S. at 419; *Songcharoen v. Plastic & Hand Surgery Assocs., P.L.L.C.*, 561 Fed. App'x 327, 332

(5th Cir. 2014) (citing *Erie R.R. Co.*, 304 U.S. at 78, 58 S. Ct. 817).   Accordingly, district courts

in the Fifth Circuit apply Louisiana law to challenges to the adequacy of the evidence in a Rule

59 motion. *See Body by Cook v. Ingersoll-Rand Co.*, 39 F. Supp. 3d 827, 844 (E.D. La. 2014).

#### C.   Remittitur inappropriate in this case.

Defendant errs in seeking a remittitur here.  "[T]his Court reviews the jury verdict in light

of Louisiana's additur/remittitur statute, [La. Code Civ. Proc. art. 1814][.]"  *Berry v. Roberson*,

No. CIV.A. 13-00145-BAJ, 2015 WL 1935884, at *3 (M.D. La. Apr. 28, 2015); *see also Great*

*West Cas. Co. v. Rodriguez-Salas*, 436 Fed. App'x 321, 328 (5th Cir. 2011) (applying Article 1814 in diversity case when defendant sought remittitur). Article 1814, entitled "Remittitur or additur as alternative to new trial; reformation of verdict," provides:

> If the trial court is of the opinion that the verdict is *so excessive or inadequate that a new trial should be granted for that reason only*, it may indicate to the party or his attorney within what time he may enter a remittitur or additur. *This remittitur or additur is to be entered only with the consent of the plaintiff or the defendant as the case may be, as an alternative to a new trial, and is to be entered only if the issue of quantum is clearly and fairly separable from other issues in the case.* If a remittitur or additur is entered, then the court shall reform the jury verdict or judgment in accordance therewith.

(emphasis added). Thus, the Court can enter a remittitur "only if 'the issue of quantum is clearly and fairly separable from other issues in the case' and the [Court] believes 'the verdict is so excessive or inadequate that a new trial should be granted for that reason only.'" 1 Frank L. Maraist, La. Civ. L. Treatise, Civil Procedure § 13:4 (2d ed. 2014).

The first requirement – that remittitur issue only if "the issue of quantum is clearly and fairly separable from other issues in the case" – is significant here. In short, quantum is not clearly and fairly separable from the issue of causation because the jury awarded a lump sum award.

In *Ellis v. Allstate Insurance Co.*, 453 So.2d 1209 (La. App. 5 Cir. 1984), the appellate court held that the trial court erred in granting a JNOV. A jury awarded a plaintiff $2,394.67 in an automobile accident case. The trial court granted a motion for a JNOV and increased the quantum award to a little under $7,000.00. The jury interrogatories did not specifically itemize the damage award but rather awarded only a total dollar amount of damages that the plaintiff suffered as a result of the injury.

After concluding that the JNOV deprived the defendant of a jury trial on the issue of quantum, the Court found that an additur would also be inappropriate under La. Code Civ. Proc.

1813 (1982), which is substantially similar to the current Article 1814.  As in the current Article

1814, the Article 1813 then in effect was interpreted to mean that "additur and remittitur [were]

available if the issue of quantum [was] clearly and fairly separable from other issues in the case."

*Id.* at 1214-1215 (quoting *Miller v. Chicago Ins. Co.*, 320 So.2d 134, 139 (La. 1975)).[3]  In

finding that an additur was not appropriate, the appellate court explained:

> The issue of quantum is not separable from the question of degree of injury.
> Defendant, as previously stated, contends the plaintiff did not prove her use of
> chiropractic services was sufficiently connected with the injury she received from
> the automobile accident. The jury verdict, it claims, reflects an exclusion of this
> amount as well as amounts for car rental and a medical report. *Since the jury*
> *damage award was an in globo award, it is impossible to discern what amounts*
> *the jury felt were appropriate for various items of damages. We find the issues of*
> *causation, degree of injury, and the amount of damages are not separable;*
> *therefore, an additur is not available in this case.*

*Id.* at 1215 (emphasis added).

Similarly, in *Davis v. State Farm Mutual Automobile Insurance Co.*, 590 So. 2d 714,

716-17 (La. App. 3 Cir. 1991), the Louisiana Third Circuit found that, "A lump sum judgment of

damages is presumed to award all items of damage claimed, and the appellant's burden of

proving the fact finder clearly abused its great discretion is more difficult than usual because the

intention to award a specific amount for any particular item is not readily ascertainable."

Citing to *Davis*, one treatise writes: "Trial courts may not grant additur *or remittitur*

where the jury renders a lump-sum award, since it is impossible to discern what amounts the jury

deemed appropriate for each item of damage."  3 Judge Steven R. Plotkin and Mary Beth Akin,

La. Prac. Civ. Proc. Article 1814 (2014 ed.) (emphasis added).

The same reasoning applies here where the Defendant seeks a remittitur.  The jury

awarded a lump sum of $300,000.00.  However, the issue of damages is tied to other issues like

---

[3] The *Ellis* court even noted that the new Article 1814 "embodied this interpretation." *Ellis*, 453 So.2d at
1215 n. 3.

the necessity of the therapy services and the extent to which the Credit may have aggravated a pre-existing condition and/or caused permanent disability. "Causation, degree of injury, and the amount of damages are not separable."

Accordingly, the Court cannot grant a remittitur. The sole issue is whether the jury abused its discretion so as to justify the granting of a new trial on the issue of damages. Further, as stated in *Davis*, because the jury awarded a lump sum, it is presumed that the jury awarded all items of damages claimed. 590 So.2d at 716.

### D. Standard for evaluating motion for new trial on the issue of damages.

Louisiana law also applies in evaluating whether to grant a new trial on the issue of damages. *See Fair v. Allen*, 669 F.3d 601, 604-605 (5th Cir. 2012). La. Code Civ. Proc. art. 1972 provides that a new trial shall be granted when "the verdict or judgment appears clearly contrary to the law and the evidence." Article 1973 provides that a new trial "may be granted in any case if there is good ground therefor, except as otherwise provided by law."

"The trial court's discretion in ruling on a motion for new trial is great." *Davis v. Wal-Mart Stores, Inc.*, 2000-0445 (La. 11/28/00), 774 So.2d 84, 93. "[T]he trial judge may evaluate evidence without favoring any party and draw his own inferences and conclusions," and he may assess the credibility of witnesses. *Id.* (citations omitted). But the Louisiana Supreme Court has cautioned that, while the trial court has wide discretion, "the discretion of the court is not limited":

> The fact that a determination on a motion for new trial involves judicial discretion, however, does not imply that the trial court can freely interfere with any verdict with which it disagrees. The discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict. Fact finding is the province of the jury, and the trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury's responsibility. *A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the*

*accuracy of the jury's factual determinations and must be viewed in that light.*
Thus, the jury's verdict should not be set aside if it *is supportable by any fair interpretation of the evidence.*

*Id.* at 93 (citations omitted) (emphasis by court).

Similarly, the Fifth Circuit has also explained:

Despite permitting a trial court to review the jury's credibility determinations, Louisiana gives the jury high deference. … When granting a new trial, the court can evaluate the evidence, draw its own inferences and conclusions, and determine whether the jury erred in giving too much credence to an unreliable witness. *Yet, Louisiana courts still accord jury verdicts great deference.* Therefore, although the Louisiana Code explicitly allows the district court to overturn a verdict that gives too much credibility to a non-believable witness, *that can be applied only in extreme situations.*

*Fair*, 669 F.3d at 605 (citations, quotations, and alterations omitted) (emphasis added).

### E. Quantum Analysis

#### 1. Summary Conclusions

The Court rejects Defendants' argument and denies a motion for new trial on the issue of quantum. As stated above, Defendants contend that Plaintiffs' damages do not exceed about $53,000.00, calculated as follows:

$ 4,000.00 for future medical expenses
$ 6,766.74 for past medical expenses
$22,000.00 for lost wages
$20,000.00 for pain and suffering
$52,766.74 in total damages

In sum, the flaws in Defendants' argument are that (1) they undervalue the lost wages, (2) they ignore the possibility of an award for future lost wages and/or loss of earning capacity, and (3) they undervalue the pain and suffering.

Dr. Boudreaux concluded that the average income base for the past six years was $5,451.00, and, based on this, he concluded that the past lost wages from the time of the incident to the trial were about $22,000. However, a reasonable juror could reach a higher number, either

by using the average income base advanced by Plaintiffs in Boudreaux's cross examination ($6,960.27) or by simply concluding that Miller would have earned one of the higher years of his salary ($10,590 from 2006 or $14,401 from 2002). Under this system, past lost wages could range from $27,841.08 to $42,360 or even $57,604

The same reasoning applies to lost future wages and lost earning capacity. While Miller did earn income in 2011 (even more than he had in several preceding years), the jury could have reasonably concluded from the testimony of Miller, his mom, and his dad as well as the medical evidence that Miller had a diminished capacity to earn following the accident. As outlined above, the base salary could be $5,451.00 (as Boudreaux said), $6,960.27 (as Plaintiffs advocated), $7,439.50 (the difference between the highest figure, $14,401, and what he made in 2011, $6,961.50), or $10,590 (from 2006). Using any of these numbers, the total lost future wages could be $97,000; $151,177.06; $161,582.94; or $230,014.80, respectively. Further, these methods of determining lost future wages and earning capacity would use the "total offset" method; Louisiana courts have approved of this approach, and it would not have been clearly erroneous for the jury to do so here. (*See* discussion, *infra*).

This future lost wage and loss of earning capacity award is critical. If the Plaintiff earned $153,000 to $164,000 in future lost wages or earning capacity, then he only needed to recover about $100,000 in general damages for his past and future physical and mental pain and suffering and loss of enjoyment of life. While this would be on the high end for a shoulder injury, the Defendant has failed to prove either (1) that this is not warranted based on the individual circumstances of this case, or (2) that this is abusively high in light of the great mass of awards in the jurisprudence. Again, Defendant has not pointed to numerous cases where an appellate court *reversed* an award for a shoulder injury like this as being abusively high. Finally, other

Louisiana court cases support this award. (*See* discussion, *infra*). On these grounds, the Defendants' motion is denied.

### 2. Past Medicals

There is undoubtedly testimony supporting an award for $ 6,766.74 for past medical expenses, including bills for Dr. Blanda, therapy, and pharmaceuticals. Plaintiff testified to this fact, (R. Doc. 130 at 112), and Defendant did not seriously dispute it.

### 3. Future Medicals

Similarly, the Defendants' estimate that future medicals were $4,000 is also not far off the mark. The Putti-Platt procedure was estimated to cost about $3.500. (Defs.' Ex. 10 at 471). Messina testified that, for the Lararjet or Bristow procedures he recommended, three to four weeks of physical therapy would be required, along with painkillers like hydrocodone for three to six weeks. (R. Doc. 131 at 255). A reasonable juror may have concluded that the Putti-Platt procedure would require the same physical therapy and drugs as the procedures Dr. Messina recommended and awarded about $500.00 or more for them.

### 4. Past Lost Wages and Lost Future Wages / Loss of Earning Capacity:

The evidence (R. Doc. 131 at 163) showed that Miller made the following wages from 2001 to 2011:

| YEAR | WAGES EARNED |
|------|--------------|
| 2001 | $5,063.97 |
| 2002 | $14,401.00 |
| 2003 | $4049.70 |
| 2004 | $4,175.27 |
| 2005 | $3,109.23 |
| 2006 | $10,590.88 |
| 2007 | $6,177.85 |
| 2008 | $4,110.77 |
| 2009 | $0.00 |
| 2010 | $0.00 |

| 2011 | $6,961.50 |
|---|---|

Concerning past wages, Defendants assume in their motion that the maximum past wages must be $22,000. Dr. Boudreaux arrived at this figure by taking the average earnings from 2006 through the accident date in 2011. (R. Doc. 131 at 164-166). To reach this number, Boudreaux added the wages earned per year in this span and divided by 5.2, as the incident occurred in February. (*Id.* at 164-165, 175-76). He arrived at an annual pretax income base of $5,451.70. (*Id.*). This figure was then multiplied by four and a fraction (representing the years between the accident and trial), and the result was about $22,000 in past lost wages. (*Id.* at 165).

But the jury could have calculated the base income differently. As Plaintiffs explained, the average annual amount could be $6,960.27 if the same 2006-2011 span is used, but the years in which Miller earned $0.0 are excluded. (R. Doc. 131, p. 175-176). Under this figure, which would represent his average earnings when he was in the workforce, the total past lost wages would be about $27,841.08.

Alternatively, the jury could have rejected Boudreaux's analysis entirely and simply decided to award Miller the high end of his earnings – $10,590 from 2006 or $14,401 from 2002. Under this analysis, lost wages would be $42,360 or $57,604.

Thus, it would not have been clearly erroneous for the jury to award past lost wages in an amount ranging from $27,841.08 to $57,604.

Concerning loss of earning capacity, the Louisiana Supreme Court has explained that this claim is not necessarily determined by a claimant's prior earnings:

> What plaintiff earned before and after the injury does not constitute the measure. Even if he had been unemployed at the time of the injury he is entitled to an award for impairment or diminution of earning power. And while his earning capacity at the time of the injury is relevant, it is not necessarily determinative of his future ability to earn. (Citation omitted). Damages should be estimated on the

injured person's ability to earn money, rather than what he actually earned before the injury.

…

Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily.

*Folse v. Fakouri*, 371 So.2d 1120, 1123-24. Further, it is well established that "[a]wards for lost future income are inherently speculative and are intrinsically unsusceptible of being calculated with mathematical certainty." *Birdsall v. Regional Elec. & Const., Inc.*, 97-0712 (La. App. 1 Cir. 4/8/98), 710 So.2d 1164, 1170 (citations omitted). Further, "[b]ecause loss of earning capacity cannot be calculated with mathematical certainty, the factfinder is accorded great discretion in making such an award." *DeRouen v. Audirsh*, 25,847, 25,848 (La. App. 2 Cir. 6/28/94), 639 So.2d 476, 478. *See also Birdsall*, 710 So.2d at 1170 ("the trier of fact is given much discretion in fixing these awards [for lost future income]").

In *Wendell v. Travelers Ins. Co.*, 2014-0002 (La. App. 4 Cir. 10/8/14), 151 So.3d 828, 835, the Court explained that medical evidence is required to prove a claim of lost future wages, but this evidence can be corroborated with lay testimony:

A claim for lost wages need not be proven with mathematical certainty; it only requires such proof which reasonably establishes plaintiff's claim, which includes plaintiff's own reasonable testimony. *Likewise, an award for future loss of earning capacity only requires medical evidence which indicates with reasonable certainty that there exists a residual disability causally related to the accident at issue. Moreover, this medical evidence may be corroborated and complemented by lay testimony including that of the plaintiff.* In determining a proper future loss of earning capacity award, factors to be considered are: the plaintiff's physical condition before the injury, the plaintiff's past work history and work consistency, the amount the plaintiff would have earned absent the injury complained of, and

the probability that the plaintiff would have continued to earn wages over the remainder of his working life.

(citations, quotations, and alterations omitted) (emphasis added).

As explained above, the jury clearly sided with Dr. Blanda's and the plaintiff's interpretation of the medical records, which showed that his shoulder still needed surgery and was still "painful" by the time Dr. Blanda saw Miller in April and July of 2012, over a year and a half after the incident. (Defs.' Ex. 10 at 459 and 462). Although a close call, given the high deference given to jury findings, there is sufficient medical evidence to indicate "with reasonable certainty that there exists a residual disability causally related to the accident."

This is further corroborated by the testimony of the Plaintiff, his mother, and his father. The Plaintiff testified that he could not work because of the law suit; he cannot lift up his arm on top of his head, cannot lift heavy objects, cannot pick up 50 pounds or more, and cannot weed-eat because of the vibration of his arm. (R. Doc. 131 at 61). Cheryl Miller testified that Miller tried to work for Cheryl's brother in law, but he could not perform the job. (*Id.* at 78). She also stated under oath that, after the incident with Credit, Miller's shoulder would come out when he picked up a bag of trash to bring to the road, lay in his bed, or played sports. (*Id.* at 77). Shelton Miller said that, after the accident, they got Miller a construction job, but he could not do the work so he had to quit. (*Id.* at 87). A jury could have very reasonably rejected Messina's testimony that he could do "some type of office work" given Miller's educational background of having "less than a high school education." (R. Doc. 131 at 158).

Thus, as Dr. Boudreaux testified, if future lost wages were awarded using his annual income base for a work life expectancy of 21.72, then Miller would have been entitled to about $97,000.00. (R. Doc. 131, p. 178-179).

Of course, the jury could have rejected Boudreaux's testimony and award even more money. For instance:

- The jury could have gone with what Plaintiff's advocated during cross examination – that Miller's annual income base was in fact $6,960.27. This is a very reasonable interpretation of the social security records. Over 21.72 years, this would yield $151,177.06.

- While Miller made $6,961.50 in 2011, he made $10,590 in 2006 and $14,401 in 2002. Thus, jury could have assumed that Miller's total lost capacity for wages was not $5,451.00 (as Boudreaux calculated based on a 6 year average) but was rather $7,439.50 per year (the difference between the highest figure, $14,401, and what he made in 2011, $6,961.50). If the jury awarded Miller future lost wages based on this $7,439.50 per year for 21.72 years, the total lost wages could have been $161,585.94.

- Finally, the jury could have found that Miller was totally disabled as of 2012, a year after the incident, and used one of his higher years - $10,590 from 2006 - to calculate his total lost wages. Over twenty years, this would yield about $230,000.

These calculations utilize the method of determining future lost earnings which calls for inflation to be offset by the discount rate, a convenient and economically sound way to project future lost earnings. Wolfgang W. Franz, *Simplifying Future Lost Earnings*, 13 TRIAL 34 (Aug. 1977). Louisiana courts have approved of the "total offset" method for determining lost future earnings. *See Sharkey v. Sterling Drug, Inc.*, 600 So.2d 701, 718 (La. App. 1st Cir. 1992), *writs den.*, 605 So.2d 1099, 1100 (La. 1992) (citing *Schwamb v. Delta Air Lines, Inc.*, 516 So.2d 452, 465 (La. App. 1st Cir. 1987), *writs den.*, 520 So.2d 750 (La. 1988)). Accordingly, the jury's decision would not be clearly contrary to law or fact if they calculated lost earning capacity in

this manner.  *See Lucas v. United States*, 807 F.2d 414, 422-423 (5th Cir. 1986) (affirming award using "total offset" method of calculating damages when no state law rejected this approach, even though the Fifth Circuit rejected this method in cases applying substantive federal law).

In sum, it was not clearly erroneous for the jury to award future lost wages.  If they did, they were not bound to award only what Boudreaux calculated.  They very reasonably could have calculated an award around $151,000 - $161,000.

### 5. General Damages - Past and Future Physical and Mental Pain and Suffering, Loss of Enjoyment of Life

Assuming that past medicals were $6,766.74; that future medicals were $4,000.00; that past lost wages were $27,841.08 (in the medium range of awards); and that future lost wages were $161,000.00 (also in the medium range of awards), then the total figure at this point would be about $200,000.  Thus, the total general damage award for past and future physical and mental pain and suffering and loss of enjoyment of life would be about $100,000.  Defendants have failed to show that this award would be an abuse of discretion.

The Louisiana Supreme Court has stated that, in reviewing an award of general damages, the Court must first examine the individual facts and circumstances of the case and only then use prior cases as, at most, a "guide," to determine if the award is "greatly disproportionate" to the "mass of past awards":

> An appellate court reviews a trial court's general damage award using the abuse of discretion standard. *The trier of fact is afforded much discretion in independently assessing the facts and rendering an award because it is in the best position to evaluate witness credibility and see the evidence firsthand.* An appellate court may disturb a damages award only after an articulated analysis of the facts discloses an abuse of discretion. … *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1261 (La.1993) (the fact finder's discretion in awarding general damages is vast and should rarely be disturbed); … *To determine whether there has been an abuse of discretion by the fact finder, the reviewing court looks first to the facts*

*and circumstances of the particular case. Only if a review of the facts reveals an abuse of discretion, is it appropriate for the appellate court to resort to a review of prior similar awards.* In a review of the facts, the test is whether the present award is *greatly disproportionate* to the mass of past awards for truly similar injuries. *It is important to note, however, that prior awards are only a guide.*

*The issue of whether the amount of damages awarded conflicts with similar awards only arises once it has been ascertained that the jury abused its discretion in determining the amount of damages awarded;*

*Miller v. LAMMICO*, 2007-1352 (La. 1/16/08), 973 So.2d 693, 711 (citation omitted) (emphasis added).

Based on the above evidence of (1) Miller's medical records, (2) Miller's testimony regarding the pain he suffered, (3) the social security records and Boudreaux's cross examination, and (4) the testimony of Miller's parents regarding his abilities and life before and after the incident, the Court finds that that the jury did not abuse its discretion in rendering the above damage award and that the award was not clearly contrary to the law and evidence

While Defendants have cited to several district court cases and a single appellate decision holding that this award is on the high side, Defendants have failed to identify cases holding that an award of $100,000 for these injuries is abusively high. On this ground as well, the Court declines to exercise its discretion in granting a new trial.

Further, jurisprudence supports this award. In *Corliss v. Baha Towers Ltd. Partnership*, 2000-2011 (La. App. 4 Cir. 8/29/01), 799 So.2d 525, 527, a man was injured after tripping and falling over cardboard boxes left in a hall. The Plaintiff diagnosed at the hospital with a torn rotator cuff. *Id.* He had surgery to repair it. *Id.* The trial court awarded $131,690.31 in general damages. *Id.* In affirming, the Fourth Circuit explained, "The trial court specifically found that Mr. Corliss was credible as to his injuries and that the injury was very painful and disabling for

sometime. We cannot find that the trial court abused its 'vast discretion' in setting the amount of general damages." *Id.* at 527-528.

Corliss is similar to the case at bar. A reasonable jury could find from the two radiologists' reports and Dr. Blanda's report that the yanking caused an "early osteoarthritis of the AC joint creating minor rotator cuff impingement" and "an intralaminar tear," as well as a Hill Sacks lesion. They will require surgery. They seem comparable with the rotator cuff tear. Most importantly, *Corliss* emphasizes the "vast discretion" in setting general damage awards. Even if the injuries here are not as severe, *Corliss* was decided almost 14 years ago and awarded $31,000 more than the damage award needed in this suit. *Corliss* is sufficient by itself to justify the award here.

Similarly, in *Selico v. Intercontinental Bulltank Corp.*, 98-0763 (La. App. 4 Cir. 5/12/99), 733 So.2d 1240, the appellate court affirmed the award of $125,000 for a severe rotator cuff injury which necessitated a surgery. A seaman slipped on a catwalk and pulled his shoulder out of place when he reached for the hand railing to catch himself. *Id.* at 1242. Approximately two weeks later, he felt that his shoulder was about to come out of place again, so he saw a doctor. *Id.* The seaman gave a history of a football injury to his shoulder in high school, as well as two or three other times when his shoulder "pooped out" of place. *Id.* The most recent occurred two years before the incident. *Id.* A doctor advised him that he had a severe rotator cuff injury and recommended surgery to form a new anterior part of the rotator cuff. *Id.* The seaman had surgery, where it was disclosed that the anterior capsule and labrum were completely torn from the anterior part of the attachment of the glenoid. *Id.* at 1242-43. The seaman remained in the hospital for nine days and had several months of physical therapy. *Id.* at 1243. At the end of therapy, the seaman lacked about fifteen degrees external rotation and about five degrees internal

rotation of the shoulder, and the doctor felt that this was an excellent result. The jury awarded $125,000 for "past, present, and future suffering, disability, mental anguish, and loss of capacity for enjoyment of life." *Id.* at 1243. The defendant did not appeal this issue, but the appellate court affirmed the lower court's decision overall.

While the injury in *Selico* may have been more severe than the one in the case at bar, ultimately the award was 25% higher than the $100,000 threshold needed in this case to support the jury award. Further, *Selico* was decided fifteen years ago, so, presumably, any award would be larger today. Thus, *Selica* also supports the award in this case.

Finally, in *Rayburn v. Ponthieux*, 2004-1547 (La. App. 3 Cir. 5/4/05), 902 So.2d 1136, the appellate court affirmed an award of general damages in the amount of $85,000. In *Rayburn*, the plaintiff, an eighty-three year old widower, was involved in an automobile accident. *Id.* at 1137. He suffered injuries to his right shoulder, neck, and lower back. *Id.* By the time of trial, the neck and lower back issues were resolved. *Id.* The plaintiff testified at trial that

> prior to the accident he had cut his own firewood, planted and harvested his own garden, tended to his own yard, and performed almost any physical task he desired. He testified that the persistent right shoulder pain now precludes most physical activities. Specifically, he suffers pain anytime he attempts to raise his right arm over his head or to use his right hand to pick up anything or push anything to the side.

*Id.* at 1137-1138. The plaintiff denied having any problems with his right shoulder in the years before the incident other than one incident about ten years earlier, where he suffered right shoulder pain and, believing he had arthritis, sought medical attention. *Id.* at 1138. He received an injection, which provided immediate and permanent relief.

After the accident, the plaintiff saw a doctor who concluded he had cervical and lumbar strains, a right sacroiliac strain, and a head injury in the accident. *Id.* at 1138. Plaintiff had seventeen physical therapy sections. *Id.* The doctor referred him to another doctor about his

shoulder, and the second doctor concluded that plaintiff had a complete rotator cuff tear. *Id.* An

MRI confirmed this. *Id.* The doctor concluded that the MRI revealed a completely torn rotator

cuff. *Id.* The shoulder had been partially torn before the accident, and the accident completed

the process. *Id.* at 1138-39. The plaintiff was not a candidate for surgery, and he would have

trouble lifting his arm over his head and reaching out to pick up anything. *Id.* at 1139. The

defendants' expert concluded that the complete tear predated the accident. *Id.*

> The Third Circuit concluded:
>
> > Thus, in this case, the undisputed facts on appeal are that Mr. Rayburn suffered a neck and back injury in the accident, both of which were resolved before trial. Additionally, the accident caused a preexisting partial rotator cuff tear of the right shoulder to completely tear. The preexisting condition had no effect on Mr. Rayburn's physical activities, but the resulting complete tear has limited his physical activities drastically. Not only can he not chop his own firewood, or plant and harvest his garden, or tend to his yard, but also he cannot even retrieve a carton of milk from the refrigerator without suffering pain. Mr. Rayburn's condition cannot be corrected by surgery and is permanent. While the generalized pain may wax and wane, each time he raises his right arm or attempts to adjust something with that arm, he suffers immediate pain.
> >
> > We do conclude that the general damage award constitutes a significant award for the injuries sustained by Mr. Rayburn. However, considering the vast discretion given to the trier of fact in awarding general damages, and taking into account the particular injuries suffered by Mr. Rayburn and the effect those injuries had on him, we do not find that the trial court abused its discretion in awarding him $85,000.00 in general damages.

*Id.* at 1140.

*Rayburn* is relevant because it involves the plaintiff suffering a pre-existing injury that

was exacerbated by the accident. While the plaintiff in *Rayburn* had other injuries, the award

was also ten years ago. Finally, while the *Rayburn* court considered the award "significant," it

did not find the award to be an abuse of discretion. Thus, while *Rayburn* shows that the award in

this case would be on the higher end of the scale, it also demonstrates that the award is supported

in the jurisprudence.

In sum, the damage award in this case was not an abuse of discretion or clearly erroneous, and the Defendant has failed to identify a single case holding that an award of this nature satisfies those standards. Moreover, there are cases in the jurisprudence supporting this award. Accordingly, Defendants' motion is denied.

### F.    New Trial because of passion or prejudice

#### 1. Defendants' Argument

Defendants claim they should be entitled to a new trial *on all issues* because the jury award resulted from passion and prejudice. Defendants point to the facts that (1) the court had to remind the jury not to discuss the case until they deliberated "several times"; (2) the jurors would communicate non-verbally by starring at one another and making hand gestures during the trial; (3) at least one juror made a remark toward plaintiff's counsel in open court; and (4) the jury asked during deliberations if a future medical expense fund could be created.

#### 2. Analysis

The Court rejects the Defendants' arguments that any of the jury conduct cited above is evidence of passion or prejudice. There is absolutely no evidence in the record that the jurors communicated with one another via starring or making hand-gestures. Further, the question asked by the jury during deliberations does not show any passion or prejudice. Most importantly, the Defendants failed to make any objection concerning any juror misconduct. The Fifth Circuit has recognized that "a party, with knowledge of a juror's misconduct, must make a timely objection and is not permitted to take his chances on a favorable verdict and if unfavorable get a second bite of the apple." *Garcia v. Murphy Pac. Marine Salvaging Co.*, 476 F.2d 303, 306 n. 2 (5th Cir. 1973). In short, the Defendant has not shown that the jury verdict was based on passion or prejudice, and the Court does not so find.

Further, while the Defendants are correct that a court can require a new trial if the jury award is "so exaggerated as to indicate bias, passion, prejudice, corruption, or other improper motive," *Wells v. Dallas Independent School Dist.*, 793 F.2d 679, 683-684 (5th Cir. 1986), the Court finds no such exaggeration here. As stated above, the Court has concluded that the jury was not clearly erroneous in its award of damages. Thus, the Court logically must conclude that the award was not so high as to be based on the jury's passion or prejudice. The Court rejects Defendants' arguments and affirms the jury award.[4]

## IV. Conclusion

Accordingly,

**IT IS ORDERED** that the Defendants' Motion to Alter or Amend Judgment, or in the Alternative, Motion for New Trial or Remittitur (R. Doc. 134) is **DENIED.**

Signed in Baton Rouge, Louisiana, on <u>July 8, 2015</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[4] Finally, the Court notes that the Defendants are incorrect in their argument that a new trial is required for all issues if the Court finds that the damage award was the product of passion or prejudice. The Fifth Circuit has expressly recognized that a new trial is only appropriate on those specific issues infected by passion or prejudice and that a jury can reach an acceptable verdict on the issue of liability but an impermissible one on damages. *See Westbrook v. General Tire Rubber Co.*, 754 F.2d 1233, 1241-42 (5th Cir. 1985).